UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
DAVID BEJOU,

                           *Plaintiff*,

           -against-

THE STATE UNIVERSITY OF NEW YORK, THE
STATE UNIVERSITY OF NEW YORK EMPIRE
STATE COLLEGE, MITCHELL NESLER, KRISTINA
JOHNSON, and JOHN DOE(S) and JANE DOE(S),

                        *Defendants.*
-------------------------------------------------------------------x

**COMPLAINT AND
JURY DEMAND**

Civil Action No.: 1:22-CV-1378
(GLS/ML)

Plaintiff, David Bejou ("Mr. Bejou" or Plaintiff), by and through his attorneys, The Wagoner

Firm PLLC, complaining of Defendants, The State University of New York ("SUNY"), The State

University of New York Empire State College ("ESC"), Mitchell Nesler ("Mr. Nesler"), Kristina

Johnson ("Ms. Johnson"), and John and Jane Does (the "Does" and together with SUNY, ESC, Mr.

Nesler, and Ms. Johnson, "Defendants"), alleges as follows:

## DESCRIPTION OF THE ACTION

1.     This case arises out of Defendants' fraudulent misrepresentations to induce Plaintiff

to accept a position at ESC and their subsequent discrimination and retaliatory treatment of Plaintiff

based on his age, race, national origin, religion, and reporting of ESC's wrongdoing.

2.     Plaintiff is a brown-skinned, 72-year-old Muslim man of Iranian national origin.

3.     Plaintiff is highly qualified and credentialed in the field of higher education

administration and was pursued by a number of higher educational institutions at or around the same

time ESC recruited him.

4.     Defendants fraudulently misrepresented ESC's enrollment levels, the size of the

college, and the position Plaintiff ultimately accepted at ESC.

4866-6349-7796, v. 7

5.      At the time of Plaintiff's hire, he was only 1 of 3 minorities in ESC's President Cabinet and executive administration.

6.      In or about August 2018, Plaintiff discovered and began reporting instances of serious fraud and malfeasance by ESC's senior management relating to inflation of enrollment numbers and other material inaccuracies within ESC.

7.      A year after being heavily recruited by ESC and within 1 month of discovering and reporting ESC's inflated enrollment numbers to Ms. Johnson, SUNY's then-Chancellor, he was demoted and his pay was cut by 58%.

8.      ESC claimed that Plaintiff's demotion was because his position was no longer needed. In fact, Plaintiff's position was needed.

9.      That is why Mr. Nesler (ESC's Officer-in-Charge) appointed another faculty member to replace Plaintiff.

10.     Plaintiff's American, white, non-Muslim, and/or female coworkers who were demoted kept a much greater percentage of their original pay.

11.     Defendants led Plaintiff to believe that they would look into resolving his demotion and reporting amicably but failed to do anything while misleading him to delay him from bringing any claims.

12.      After Defendants refused to meaningfully address his concerns, he filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC").

13.     Following the Plaintiffs' receipt of a right-to-sue letter on September 22, 2022, Plaintiff filed the instant complaint.

14.     Plaintiff now asserts causes of action against Defendants for (1) fraud, (2) age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"), (3) racial discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), (4) national origin

2

discrimination under Title VII, (5) religious discrimination under Title VII, and (6) retaliatory employment practices under Title VII.

15.     Plaintiff seeks monetary damages to remedy Defendants' fraud and the deprivation of civil rights secured to him by the Constitution, statutes, and regulations of the United States arising out of violations committed by Defendants while and after Plaintiff served as ESC's Provost and Executive Vice President for Academic Affairs.

16.     Defendants' unlawful, unconstitutional actions caused Plaintiff substantial and continuing emotional and economic harm, which he now seeks to recover in the form of monetary damages, attorneys' fees, and other expenses, including the costs of this action together with interest.

**PARTIES**

17.     Plaintiff Mr. Bejou is an individual who resides in Midlothian, Virginia but resided in Saratoga Springs, New York during most of the events described herein.

18.     At all relevant times herein, Plaintiff is an "employee" within the meaning of Title VII.

19.     Defendant SUNY is a governmental agency of the State of New York with its principal place of business in Albany, New York.

20.     Defendant ESC is a member of the SUNY system with its principal location in Saratoga Springs, New York.

21.     At all relevant times herein, Defendants are "employers" within the meaning of Title VII.

22.     Upon information and belief, Defendant Mr. Nesler is an individual who at all times relevant herein resides in the State of New York.

23.     Upon information and belief, Defendant Ms. Johnson is an individual who resides in Columbus, Ohio but resided in the State of New York during most of the events described herein.

4866-6349-7796, v. 7

24.     Defendants John Doe(s) and Jane Doe(s) are persons not yet known to Plaintiff whose names will be added once their identities are ascertained.

## JURISDICTION AND VENUE

25.     This Court may exercise personal jurisdiction over SUNY, ESC, and Mr. Nesler pursuant to CPLR 301 because they are domiciliaries of the State of New York.

26.     This Court may exercise personal jurisdiction over Ms. Johnson pursuant to CPLR 302 because she committed a tortious act within the State of New York.

27.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28. U.S.C. § 1332 because Plaintiff and all Defendants are citizens of different states and the amount in controversy exceeds $75,000.

28.     The Court also has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because Plaintiff's primary claims arise under the laws of the United States and Plaintiff's other claims are so related to his federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

29.     Venue is proper in this Court pursuant 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to claims asserted herein occurred within the Northern District of New York.

## BACKGROUND AND FACTUAL ALLEGATIONS

I.      Plaintiff's Background and Qualifications.

30.     Plaintiff is a life-long educator who holds a Bachelor's Degree in Linguistics and English Literature, a Master of Business Administration Degree in Aviation/Airway Management Operations, a Doctor of Philosophy Degree in Business and Marketing, and has participated in professional development courses at Harvard's Graduate School of Education.

31.     Plaintiff has worked at various higher education institutions since 1986.

4866-6349-7796, v. 7

32.     During this period, Plaintiff served as a senior and executive administrator as Head of Griffith University's Retailing Program; as Professor, Division Head for Behavioral Sciences and Business, Interim Graduate Dean, and the Interim Vice President for Academic Affairs at Texas A&M University; as Professor, Vice Provost for Administration, and Dean of College of the Business at Virginia State University; as Professor and Dean of the School of Business and Economics at Elizabeth City State University, a constituent of University of North Carolina System; as Professor and Dean of the College of Business and Social Sciences at West Virginia State University; and most recently as current Professor and former Provost and Executive Vice President for Academic Affairs at ESC.

33.     In 1997, Plaintiff founded and began serving as Editor-in-Chief of the Taylor and Francis Group's Journal of Relationship Marketing, a reputable international academic journal.

34.     Plaintiff has extensive experience with higher education administration, enrollment management, academic programs, accreditation bodies, supervising, fundraising, managing alumni relations, internal and external communications, and oversight of and working with boards of directors.

35.     Plaintiff is internationally recognized in the field of Relationship Marketing with 6 books and over 60 peer-reviewed academic publications.

36.     Plaintiff's publications were used in reports to U.S. Senate, U.S. House of Representatives, and American Bar Association. According to Google Scholar, Plaintiff's publications have been cited 4098 times by other scholars internationally.

37.     Plaintiff also founded and then led the International Human Right Conference at West Virginia State University until his departure in 2017.

4866-6349-7796, v. 7

II.     Defendants' Recruitment of Plaintiff.

38.     Based on Plaintiff's experience and qualifications, he was heavily recruited by several higher-education institutions starting in and around December of 2016.

39.     One of these institutions was ESC.

40.     Defendants encouraged Plaintiff to leave his home and position as Dean of the College of Business and Social Sciences at West Virginia State University to move to New York and accept the position of Provost and Executive Vice President for Academic Affairs at ESC.

41.     To impress Plaintiff and make ESC appear more attractive than the other institutions pursuing Plaintiff, Defendants told Plaintiff that ESC had more than 19,000 students and 1,300 faculty members, that Plaintiff would be given a great deal of authority to oversee the college's faculty and student body and work with enrollment management, and that he would receive a promotion in title and a salary of $187,500 if he accepted ESC's offer, with annual salary increases thereafter.

42.     ESC confirmed they needed to fill this important role and convinced Plaintiff to take the Provost and Executive Vice President positions.

43.     ESC promised Plaintiff that he would receive the same salary reduction as previous Provosts if Plaintiff decided to step down or was asked to return to faculty.

44.     In reliance on these representations and promises, Plaintiff accepted the offer to join ESC as Provost and Executive Vice President for Academic Affairs in July of 2017.

45.     Shortly after joining ESC, Plaintiff learned that during the period of time leading up to Plaintiff's recruitment, ESC's President lost the support of ESC's faculty.

46.     Plaintiff learned that ESC's faculty was prepared to give ESC's President a vote of no confidence.

6

47. ESC's President lobbied ESC faculty not to give her vote of no confidence because it would have made it extremely difficult to hire an experienced and highly qualified Provost like Plaintiff.

48. ESC faculty agreed to wait until after Plaintiff was hired to take action regarding the position of President.

49. Plaintiff was viewed by ESC and its faculty as a solution to problems that existed within ESC.

III.   <u>Plaintiff Uncovers Fraud at ESC</u>.

50. At ESC, Plaintiff led its undergraduate, graduate, School for Graduate Studies, School of Nursing, Harry Van Arsdale Jr. Center for Labor Studies, Online Division, and International Programs.

51. Plaintiff managed a budget of $45 million.

52. Plaintiff oversaw the success of the student body, with over 50% online, and over 2,000 faculty and staff at 34 locations throughout the state of New York and at 8 international locations. He ensured high quality of education through face-to-face, online, and a blend of all modes of learning at the associate, bachelor and master's levels.

53. Then, 6 months after Plaintiff was hired, ESC's President announced that she was leaving ESC to become the President of Thomas Edison State University in New Jersey.

54. A that time, SUNY and Ms. Johnson invited Plaintiff to interview for the Officer-In-Charge Position at ESC. However, Ms. Johnson chose Mr. Nesler, ESC's then-Vice President for Decision Support.

55. Approximately 6 months later, Plaintiff began to uncover discrepancies in ESC's reported enrollment numbers that alarmed him.

56.    At that time, ESC (through Mr. Nesler) would not verify enrollment records or provide backup data to support the data that was released to the faculty, student body, or the public.

57.    Other than the number of allegedly enrolled students, ESC would not disclose how that figure was calculated or provide supporting information to anyone – even SUNY.

58.    Plaintiff found this deeply concerning and brought this issue to John Lawless ("Mr. Lawless"), an Associate Dean at ESC and one of Plaintiff's direct reports.

59.    In September 2018, Plaintiff emailed SUNY administration staff to learn about SUNY's definition of continuing enrollment.

60.    Shortly thereafter, Mr. Lawless confirmed that the enrollment data disseminated by ESC and Mr. Nesler was  misleading and not accurate.

61.    Plaintiff discovered that ESC and Mr. Nesler used a definition of "continuing student" different from SUNY's definition by including students who were enrolled at ESC during the preceding 3 years, regardless of whether such non-registered students intended on taking any courses.

62.    In other words, ESC included non-enrolled individuals as enrolled students in their publications while other SUNY colleges did not include them in their enrollment calculations.

63.    Mr. Lawless admitted to Plaintiff that the actual number of enrolled students was actually about 10,000 or approximately half of what Defendants represented to Plaintiff.

64.    On September 19, 2018 Mr. Nesler held a meeting to address these enrollment issues, but asked Plaintiff not to attend despite this being the type of meeting that Plaintiff's position normally required him to attend and this issue was being discussed in large part because Plaintiff's ongoing concerns about it.

65.    Realizing that he was being intentionally shut out of ESC's internal meetings, Plaintiff prepared to report his findings to the then-SUNY Chancellor, Ms. Johnson.

IV.   Defendants' Discriminatory and Retaliatory Actions.

66.   On September 21, 2018, before Plaintiff could meet with Ms. Johnson, Defendants stripped Plaintiff of the titles of Provost and Vice President of Academic Affairs, demoted him to faculty professor, and reduced his salary to $108,000 (a decrease of $79,500 or about 58%), despite ESC's promise that Plaintiff's salary decrease would match previous Provosts if Plaintiff returned to faculty.

67.   Plaintiff proceeded to engage in extensive communications with Ms. Johnson, SUNY auditors, and others at SUNY to discuss Defendants' retaliatory actions.

68.   Plaintiff appealed the decision to demote him and cut his salary by more than half and requested an investigation into Mr. Nesler's conduct.

69.   SUNY and Ms. Johnson promised an investigation and a solution for the unfair treatment that Plaintiff endured.

70.   SUNY and Ms. Johnson instructed Plaintiff to deliver evidence to a SUNY auditor to investigate.

71.   Plaintiff delivered evidence to Defendants to substantiate his claims.

72.   Ms. Johnson encouraged Plaintiff to be patient with SUNY investigation and promised to help Plaintiff with his salary discrepancy and find other positions for him.

73.   Upon information and belief, Ms. Johnson and SUNY sought to delay Plaintiff from filing an EEOC complaint or commencing a legal action.

74.   Plaintiff detrimentally relied on Ms. Johnson's and SUNY's requests to work with them rather than filing an EEOC complaint or commencing a legal action by delaying any such filings.

75.   Plaintiff was also delayed in filing an EEOC complaint or commencing a legal action by the Coronavirus-19 Pandemic that shut down the New York court system for months in 2020.

4866-6349-7796, v. 7

76.     Ultimately, after years of delay, misdirection, and deflection, SUNY and Ms. Johnson failed to address Defendants' mishandling of enrollment data and the decision to demote Plaintiff and reduce his salary by over 50%.

77.     As a Muslim and Iranian man, Plaintiff was one of the only minorities in ESC's senior administration and President's Cabinet.

78.     On the other hand, Mr. Nesler – Plaintiff's superior – is a Caucasian and Jewish man in his 40s who was implicated in the misconduct discovered and reported by Plaintiff.

79.     Mr. Nesler's rationale for demoting Plaintiff only a year after he was hired was that his position was no longer needed.

80.     If the position was no longer needed, Plaintiff would not have been vigorously pursued in a widely advertised national search just 12 months earlier to fill that position.

81.     Further, ESC would not have replaced Plaintiff with another faculty member shortly after demoting him.

82.     Rather, this was a mere pretext to unlawfully discriminate against Plaintiff based on his age, race, national origin, religion, and retaliate against him for his investigation into and reporting of malfeasance at ESC.

83.     Similarly situated ESC Provosts who were asked to step down received much less severe salary reductions than Plaintiff did.

84.     These similarly situated ESC Provosts were American, white, non-Muslim, and/or female.

85.     When it became clear that Defendants would not even attempt to rectify the Defendants' discrimination and retaliation, Plaintiff filed a complaint with the EEOC on or about July 14, 2022.

86.     When other faculty members at ESC learned of Plaintiff's EEOC complaint, Plaintiff was approached by others who indicated that they were also discriminated against by Defendants.

87.     Plaintiff learned that there is a pattern of discriminatory employment practices at ESC.

88.     ESC had a practice of not promoting qualified employees due to their status as members of a protected class or classes.

89.     ESC had a practice of promoting young, female, non-diverse employees at the expense of employees belonging to a protected class or classes – like Plaintiff.

90.     On or about September 22, 2022, the EEOC sent Plaintiff a ninety (90) day notice of his right to sue.

91.     As a result, Plaintiff commenced this action to recover damages for Defendants' fraud, discrimination, and retaliatory employment actions.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS
#### (Fraud - Violation of New York Common Law)

92.     Plaintiff repeats and realleges each and every allegation set forth in this Complaint as if fully set forth herein.

93.     Defendants knowingly and intentionally made false representations regarding ESC's student enrollment levels to induce Plaintiff to accept a position at ESC instead of staying at his current job or taking a job with another institution.

94.     Defendants did this to facilitate recruiting Plaintiff from West Virginia State University, a Historically Black College or University ("HBCU").

95.     Defendants also intentionally misrepresented ESC's enrollment numbers to help it attract more students and other faculty and staff nationally and internationally.

96.     Defendants knew that ESC had significantly fewer enrolled students than was represented to Plaintiff but made the representations anyway.

4866-6349-7796, v. 7

97.    Defendants intentionally withheld the true number of enrolled students at ESC to make ESC appear more desirable to Plaintiff.

98.    Defendants' intended for Plaintiff to rely on Defendants' misrepresentations and accept a position at ESC instead of another institution.

99.    It was justifiable for Plaintiff to rely on Defendants' misrepresentations because Defendants used manufactured data to convince Plaintiff that their representations were true.

100.    Plaintiff actually relied on Defendants' misrepresentations when deciding to leave his position at West Virginia State University, moving from West Virginia to New York, discontinuing discussions with other higher-education institutions in favor of ESC, and accepting ESC's offer.

101.    When Plaintiff discovered and reported that Defendants' representations about ESC's enrollment levels were false, Plaintiff was demoted and his salary was reduced by 58%.

102.    Plaintiff was damaged by his reliance on Defendants' misrepresentations because, among other things, he now has an inferior title, has taken many steps backwards in his professional career, makes approximately $14,000 less than he did at West Virginia State University, moved from West Virginia to New York, and suffered discrimination and repeated retaliation for reporting that he discovered Defendants' misrepresentations.

103.    But-for Defendants' false misrepresentations, Plaintiff would not have left his previous place of employment, moved from West Virginia to New York, or accepted a position at ESC.

104.    Defendants' false misrepresentations directly and proximately caused the damages for which Plaintiff is entitled to compensation.

105.    Accordingly, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial that exceeds $75,000 including, but not limited to, back pay, lost

wages, future wages, punitive damages, statutory penalties, liquidated damages, attorneys' fees, costs, disbursements, interest, and such other legal and equitable relief as the Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS
### (Age Discrimination - Violation of 29 U.S.C. § 621, *et seq*.)

106.    Plaintiff repeats and realleges each and every allegation set forth in this Complaint as if fully set forth herein.

107.    At all relevant times herein, Defendants were Plaintiff's employer within the meaning of the ADEA as Defendants are engaged in an industry affecting commerce and have 20 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year.

108.    At all relevant times herein, Plaintiff was Defendants' employee within the meaning of the ADEA as he was and is an individual employed by Defendants.

109.    At all relevant times herein, Plaintiff was over the age of forty (40) and, consequently, a member of a protected class.

110.    By virtue of Plaintiff's work history and experience, he was qualified for the positions of Provost and Executive Vice President for Academic Affairs at ESC.

111.    Defendants' appointment of Plaintiff to the positions of Provost and Executive Vice President for Academic Affairs at ESC confirms that Plaintiff was qualified for these positions.

112.    Plaintiff satisfactorily performed his duties as Provost and Executive Vice President for Academic Affairs as evidenced by his employee file, numerous faculty and administrators' exemplary recognition letters, and positive performance reports.

113.    However, Plaintiff suffered a materially adverse employment action when Defendants demoted Plaintiff to faculty professor and reduced his salary by 58%.

114.     Similarly situated Provosts who were asked to step down did not receive a 58% reduction in salary like Plaintiff did.

115.     Defendants' explanation that Plaintiff's demotion was because his position was no longer needed was merely a pretext to discriminate against Plaintiff based on his age and/or age stereotyping.

116.     Defendants demoted Plaintiff to faculty professor and reduced his salary by 58% because of his age.

117.     Plaintiff discovered Defendants' true motivation for demoting him to faculty professor from coworkers after they learned of Plaintiff's EEOC claim.

118.     Upon information and belief, Defendants sought to replace Plaintiff with an individual or individuals outside of his protected class.

119.     Mr. Nesler, a younger man than Plaintiff, approved the decision to demote Plaintiff to faculty professor and reduce his salary by 58%.

120.     The circumstances surrounding Plaintiff's demotion to faculty professor and reduction of his salary by 58% give rise to an inference of age discrimination.

121.     Defendants' disparate treatment of Plaintiff cannot be explained by a legitimate, neutral, non-discriminatory reason for demoting him to faculty professor and reducing his salary by 58%.

122.     But-for Plaintiff's age and/or age stereotyping, he would not have suffered the adverse employment action that he did.

123.     Defendants' disparate treatment of Plaintiff directly and proximately caused the damages for which he is entitled to compensation.

124.     Accordingly, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial that exceeds $75,000 including, but not limited to, back pay, lost

wages, future wages, punitive damages, statutory penalties, liquidated damages, attorneys' fees, costs, disbursements, interest, and such other legal and equitable relief as the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS**
**(Racial Discrimination - Violation of 42 U.S.C. § 2000e,** *et seq.***)**

125.     Plaintiff repeats and realleges each and every allegation set forth in this Complaint as if fully set forth herein.

126.     At all relevant times herein, Defendants were Plaintiff's employer within the meaning of Title VII as Defendants are engaged in an industry affecting commerce and have 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year.

127.     At all relevant times herein, Plaintiff was Defendants' employee within the meaning of Title VII as he is an individual employed by Defendants.

128.     At all relevant times herein, Plaintiff is brown skinned, Persian, and of Iranian national origin and, consequently, a member of a protected class or classes.

129.     By virtue of Plaintiff's work history and experience, he was qualified for the positions of Provost and Executive Vice President for Academic Affairs at ESC.

130.     Defendants' appointment of Plaintiff to the positions of Provost and Executive Vice President for Academic Affairs at ESC confirms that Plaintiff was qualified for these positions.

131.     Plaintiff satisfactorily performed his duties as Provost and Executive Vice President for Academic Affairs as evidenced by his employee file, numerous faculty and administrators' exemplary recognition letters, and positive performance reports.

132.     However, Plaintiff suffered a materially adverse employment action when Defendants demoted Plaintiff to faculty professor and reduced his salary by 58%.

4866-6349-7796, v. 7

133.    Similarly situated Provosts who were asked to step down did not receive as significant of a salary reduction as Plaintiff.

134.    Defendants' explanation that Plaintiff's demotion was because his position was no longer needed was merely a pretext to discriminate against Plaintiff based on his race and/or racial stereotyping.

135.    Defendants demoted Plaintiff to faculty professor and reduced his salary by 58% because of his race and/or racial stereotyping.

136.    Plaintiff discovered Defendants' true motivation for demoting him to faculty professor from coworkers after they learned of Plaintiff's EEOC claim.

137.    Upon information and belief, Defendants sought to replace Plaintiff with an individual or individuals outside of his protected class.

138.    Mr. Nesler, a Caucasian man, approved the decision to demote Plaintiff to faculty professor and reduce his salary by 58%.

139.    The circumstances surrounding Plaintiff's demotion to faculty professor and reduction of his salary by 58% give rise to an inference of racial discrimination.

140.    Defendants' disparate treatment of Plaintiff cannot be explained by a legitimate, neutral, non-discriminatory reason for demoting him to faculty professor and reducing his salary by 58%.

141.    But-for Plaintiff's race and/or racial stereotyping, he would not have suffered the adverse employment action that he did.

142.    Defendants' disparate treatment of Plaintiff directly and proximately caused the damages for which he is entitled to compensation.

143.    Accordingly, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial that exceeds $75,000 including, but not limited to, back pay, lost

wages, future wages, punitive damages, statutory penalties, liquidated damages, attorneys' fees, costs, disbursements, interest, and such other legal and equitable relief as the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS**
**(National Origin Discrimination - Violation of 42 U.S.C. § 2000e, *et seq*.)**

144.     Plaintiff repeats and realleges each and every allegation set forth in this Complaint as if fully set forth herein.

145.     At all relevant times herein, Defendants were Plaintiff's employer within the meaning of Title VII as Defendants are engaged in an industry affecting commerce and have 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year.

146.     At all relevant times herein, Plaintiff was Defendants' employee within the meaning of Title VII as he is an individual employed by Defendants.

147.     At all relevant times herein, Plaintiff is brown skinned, Persian, and of Iranian national origin and, consequently, a member of a protected class or classes.

148.     By virtue of Plaintiff's work history and experience, he was qualified for the positions of Provost and Executive Vice President for Academic Affairs at ESC.

149.     Defendants' appointment of Plaintiff to the positions of Provost and Executive Vice President for Academic Affairs at ESC confirms that Plaintiff was qualified for these positions.

150.     Plaintiff satisfactorily performed his duties as Provost and Executive Vice President for Academic Affairs as evidenced by his employee file, numerous faculty and administrators' exemplary recognition letters, and positive performance reports.

151.     However, Plaintiff suffered a materially adverse employment action when Defendants demoted Plaintiff to faculty professor and reduced his salary by 58%.

152.    Similarly situated Provosts who were asked to step down did not receive as significant of a salary reduction as Plaintiff.

153.    Defendants' explanation that Plaintiff's demotion was because his position was no longer needed was merely a pretext to discriminate against Plaintiff based on his national origin and/or national origin stereotyping.

154.    Defendants demoted Plaintiff to faculty professor and reduced his salary by 58% because of his national origin and/or national origin stereotyping.

155.    Plaintiff discovered Defendants' true motivation for demoting him to faculty professor from coworkers after they learned of Plaintiff's EEOC claim.

156.    Upon information and belief, Defendants sought to replace Plaintiff with an individual or individuals outside of his protected class.

157.    Mr. Nesler, an American man, approved the decision to demote Plaintiff to faculty professor and reduce his salary by 58%.

158.    The circumstances surrounding Plaintiff's demotion to faculty professor and reduction of his salary by 58% give rise to an inference of national origin discrimination.

159.    Defendants' disparate treatment of Plaintiff cannot be explained by a legitimate, neutral, non-discriminatory reason for demoting him to faculty professor and reducing his salary by 58%.

160.    But-for Plaintiff's national origin and/or national origin stereotyping, he would not have suffered the adverse employment action that he did.

161.    Defendants' disparate treatment of Plaintiff directly and proximately caused the damages for which he is entitled to compensation.

162.    Accordingly, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial that exceeds $75,000 including, but not limited to, back pay, lost

4866-6349-7796, v. 7

wages, future wages, punitive damages, statutory penalties, liquidated damages, attorneys' fees, costs, disbursements, interest, and such other legal and equitable relief as the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS**
**(Religious Discrimination – Violation of 42 U.S.C. § 2000e, *et seq*.)**

163.    Plaintiff repeats and realleges each and every allegation set forth in this Complaint as if fully set forth herein.

164.    At all relevant times herein, Defendants were Plaintiff's employer within the meaning of Title VII as Defendants are engaged in an industry affecting commerce and have 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year.

165.    At all relevant times herein, Plaintiff was Defendants' employee within the meaning of Title VII as he is an individual employed by Defendants.

166.    At all relevant times herein, Plaintiff is a practicing Muslim and, consequently, a member of a protected class.

167.    By virtue of Plaintiff's work history and experience, he was qualified for the positions of Provost and Executive Vice President for Academic Affairs at ESC.

168.    Defendants' appointment of Plaintiff to the positions of Provost and Executive Vice President for Academic Affairs at ESC confirms that Plaintiff was qualified for these positions.

169.    Plaintiff satisfactorily performed his duties as Provost and Executive Vice President for Academic Affairs as evidenced by his employee file, numerous faculty and administrators' exemplary recognition letters, and positive performance reports.

170.    However, Plaintiff suffered a materially adverse employment action when Defendants demoted Plaintiff to faculty professor and reduced his salary by 58%.

171.    Similarly situated Provosts who were asked to step down did not receive as significant of a salary reduction as Plaintiff did.

172.    Defendants' explanation that Plaintiff's demotion was because his position was no longer needed was merely a pretext to discriminate against Plaintiff based on his religion and/or religious stereotyping.

173.    Defendants demoted Plaintiff to faculty professor and reduced his salary by 58% because of his religion and/or religious stereotyping.

174.    Plaintiff discovered Defendants' true motivation for demoting him to faculty professor from coworkers after they learned of Plaintiff's EEOC claim.

175.    Upon information and belief, Defendants sought to replace Plaintiff with an individual or individuals outside of his protected class.

176.    Mr. Nesler, a Jewish man, approved the decision to demote Plaintiff to faculty professor and reduce his salary by 58%.

177.    The circumstances surrounding Plaintiff's demotion to faculty professor and reduction of his salary by 58% give rise to an inference of religious discrimination.

178.    Defendants' disparate treatment of Plaintiff cannot be explained by a legitimate, neutral, non-discriminatory reason for demoting him to faculty professor and reducing his salary by 58%.

179.    But-for Plaintiff's religion and/or religious stereotyping, he would not have suffered the adverse employment action that he did.

180.    Defendants' disparate treatment of Plaintiff directly and proximately caused the damages for which he is entitled to compensation.

181.    Accordingly, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial that exceeds $75,000 including, but not limited to, back pay, lost

wages, future wages, punitive damages, statutory penalties, liquidated damages, attorneys' fees, costs, disbursements, interest, and such other legal and equitable relief as the Court deems just and proper.

**AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANTS**
**(Retaliation – Violation of 42 U.S.C. § 2000e, *et seq*.)**

182.    Plaintiff repeats and realleges each and every allegation set forth in this Complaint as if fully set forth herein.

183.    At all relevant times herein, Defendants were Plaintiff's employer within the meaning of Title VII as Defendants are engaged in an industry affecting commerce and have 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year.

184.    At all relevant times herein, Plaintiff is Defendants' employee within the meaning of Title VII as he is an individual employed by Defendants.

185.    At all relevant times herein, Plaintiff was engaged in a protected activity by reporting instances of widespread fraud, misconduct, malfeasance, and violations of laws and/or regulations within ESC and/or opposing and refusing to engage in the same.

186.    At all relevant times herein, Defendants were aware that Plaintiff was engaged in this protected activity by virtue of the numerous reports made by Plaintiff and extensive communications between Plaintiff and Defendants concerning the same.

187.    By virtue of Plaintiff's work history and experience, he was qualified for the positions of Provost and Executive Vice President for Academic Affairs at ESC.

188.    Defendants' appointment of Plaintiff to the positions of Provost and Executive Vice President for Academic Affairs at ESC confirms that Plaintiff was qualified for these positions.

4866-6349-7796, v. 7

189.    Plaintiff satisfactorily performed his duties as Provost and Executive Vice President for Academic Affairs as evidenced by his employee file, numerous faculty and administrators' exemplary recognition letters, and positive performance reports.

190.    However, Plaintiff suffered a materially adverse employment action when Defendants demoted Plaintiff to faculty professor and reduced his salary by 58%.

191.    Similarly situated Provosts who were asked to step down did not receive a 58% reduction in salary like Plaintiff did.

192.    Defendants' explanation that Plaintiff's demotion was because his position was no longer needed was merely a pretext to retaliate against Plaintiff based on his reporting instances of intentional, widespread fraud, misconduct, malfeasance, and violations of laws and/or regulations within ESC and/or opposing and refusing to engage in the same.

193.    Defendants demoted Plaintiff to faculty professor and reduced his salary by 58% because of his reporting instances of widespread fraud, misconduct, malfeasance, and violations of laws and/or regulations within ESC and/or opposing and refusing to engage in the same.

194.    Plaintiff discovered Defendants' true motivation for demoting him to faculty professor from coworkers after they learned of Plaintiff's EEOC claim.

195.    Upon information and belief, Defendants sought to replace Plaintiff with an individual or individuals outside of his protected class and/or who were not engaging in protected activities.

196.    Mr. Nesler, an individual implicated in the activities reported by Plaintiff, approved the decision to demote Plaintiff to faculty professor and reduce his salary by 58%.

197.    The circumstances surrounding Plaintiff's demotion to faculty professor and reduction of his salary by 58% give rise to an inference of retaliation.

198.    Defendants' disparate treatment of Plaintiff cannot be explained by a legitimate, neutral, non-retaliatory reason for demoting him to faculty professor and reducing his salary by 58%.

199.    But-for Plaintiff's reporting instances of widespread fraud, misconduct, malfeasance, and violations of laws and/or regulations within ESC and/or opposing and refusing to engage in the same, he would not have suffered the adverse employment action that he did.

200.    Defendants' disparate treatment of Plaintiff directly and proximately caused the damages for which he is entitled to compensation.

201.    Accordingly, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial that exceeds $75,000 including, but not limited to, back pay, lost wages, future wages, punitive damages, statutory penalties, liquidated damages, attorneys' fees, costs, disbursements, interest, and such other legal and equitable relief as the Court deems just and proper.

4866-6349-7796, v. 7

**WHEREFORE**, Plaintiff respectfully requests that the Court issue an Order and/or Judgment:

1.      Permanently enjoining Defendants, along with their officers, agents, successors, employees, attorneys, and any other person acting on behalf of or in concert with Defendants, from discriminating or retaliating against Plaintiff;

2.      Reinstating Plaintiff to his previous position as ESC's Provost and Executive Vice President for Academic Affairs;

3.      Awarding actual monetary and exemplary damages to Plaintiff in an amount to be determined at trial that exceeds $75,000;

4.      Awarding damages to Plaintiff, according to proof, including, but not limited to, back wages, together with related monetary benefits, interest, lost wages, and future wages in an amount that exceeds $75,000;

5.      Awarding Plaintiff all penalties available under applicable laws;

6.      Awarding Plaintiff the costs of this action, including expert fees;

7.      Awarding Plaintiff his attorneys' fees, including fees pursuant to the ADEA, Title VII, and other applicable laws;

8.      Awarding Plaintiff pre-judgment and post-judgment interest, as provided by law; and

9.      Awarding Plaintiff such other and further legal and equitable relief as this Court deems necessary, just, and proper.


Dated:  December 21, 2022
        Albany, New York

                                        **THE WAGONER FIRM PLLC**

                                        By: _____
                                                Matthew D. Wagoner, Esq.
                                                Bar Roll No. 517679
                                                Matthew W. Rimkunas, Esq.
                                                Bar Roll No. 703584
                                                *Attorneys for Plaintiff David Bejou*
                                                150 State Street, Suite 504
                                                Albany, New York 12207
                                                Tel: (518) 400-0955
                                                matt@thewagonerfirm.com
                                                matthew@thewagonerfirm.com

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by

jury as to all issues.

Dated:   December 21, 2022
             Albany, New York

                                                    **THE WAGONER FIRM PLLC**

                                            By: _____
                                                    Matthew D. Wagoner, Esq.
                                                    Bar Roll No. 517679
                                                    Matthew W. Rimkunas, Esq.
                                                    Bar Roll No. 703584
                                                    *Attorneys for Plaintiff David Bejou*
                                                    150 State Street, Suite 504
                                                    Albany, New York 12207
                                                    Tel: (518) 400-0955
                                                    matt@thewagonerfirm.com
                                                    matthew@thewagonerfirm.com